1
2
3
4
5
6                   UNITED STATES DISTRICT COURT

7                        DISTRICT OF NEVADA

8                              * * *

9    ROBERT CHARLES JONES,              Case No. 3:11-cv-00467-MMD-WGC

10                      Petitioner,
                                                    ORDER
11        v.

12   JACK PALMER, *et al.,*

13                      Respondents.

14

15        Before the Court for decision is a habeas corpus petition under 28 U.S.C. § 2254

16   brought by Robert Charles Jones, a Nevada prisoner.

17   I.   **BACKGROUND**[1]

18        Jones challenges his Nevada state conviction for the first-degree murder of

19   Rayfield Brown on September 29, 1978. The Nevada Supreme Court recounted the

20   circumstances of the crime and the guilt phase of Jones' trial as follows:

21             In the early morning hours of September 29, 1978, an argument
          erupted in the Chy Inn Bar between Jones and Rayfield Brown. Another
22        bar patron, Bobby Lee Robinson, testified that he tried to put an end to the
          argument by buying everybody a drink. Jones picked up the bottle of vodka
23        Robinson had purchased for him, drank the contents, and then handed the
          bottle to Robinson. Robinson put the bottle back on the bar counter and
24        moved away to play some records. Approximately three minutes later
          Jones walked out of the bar, returned with a handgun, pointed it to Brown's
25        head and fired the gun. Brown died shortly thereafter of the gunshot wound
          to the head.
26

27   _____

28        [1]Except where noted, this background is derived from the exhibits provided by
     the petitioner (ECF Nos. 34-41) and this Court's own docket.

Jones left the bar before police arrived. He returned to his uncle's house, where he resided, and told a cousin that he had shot a man at a bar. Jones attempted to flee to Massachusetts by bus but was arrested enroute [sic] in Vail, Colorado.

The degree of Jones' intoxication was disputed during the trial. Defense counsel argued that Jones could not be guilty of first degree murder because he was severely intoxicated at the time of the shooting. Jones' uncle testified that Jones was intoxicated at 12:30 a.m., several hours before the confrontation at the bar. Another defense witness testified that Jones was stumbling over shrubbery and appeared to be drunk at about 6:00 a.m., approximately one to two hours after the shooting. Eyewitnesses to the murder testified that Jones' gait and speech were normal, and that he did not appear drunk. The evidence also indicated that Jones managed to bury the gun and walk home via an inconspicuous route, indicating that Jones was capable of premeditating the murder.

*Jones v. State*, 707 P.2d 1128, 1129-30 (Nev. 1985).

The case was pursued by the State as a capital murder case. After a first trial ended in a mistrial, Jones was convicted of first-degree murder in a second trial and sentenced to death pursuant to the jury's penalty phase verdict. On October 17, 1985, the Nevada Supreme Court issued a decision that affirmed Jones' first degree murder conviction, but set aside his death sentence based on a finding that the jury was misled into thinking that death sentences could not be commuted.

On remand to the state district court, the State sought the death penalty, and a penalty hearing was set for March 23, 1987. At that hearing, the parties informed the court that Jones had agreed to stipulate to a sentence of life without possibility of parole. The court canvassed Jones and, on April 10, 1987, entered a judgment of conviction with the agreed upon sentence.

In 1988, Jones, proceeding pro se, initiated a state post-conviction proceeding in state district court. The court denied relief. Jones did not appeal.

In April 1997, Jones filed a habeas proceeding in this Court that was assigned case number CV-S-97-00600-JBR-RJJ. In December 1998, the Court dismissed the action because the pleadings before the Court presented only unexhausted claims. Jones' motion for reconsideration was denied on February 9, 1999. Jones did not appeal the dismissal.

2

1    On November 28, 2000, Jones filed a second state post-conviction petition in the

2    state district court. Then, on January 30, 2001, he filed a motion to withdraw guilty plea.

3    The state district court denied relief, and the Supreme Court of Nevada affirmed in

4    consolidated appeals. Between 2008 and 2010, Jones filed numerous additional state

5    court challenges to his conviction and sentence, all unsuccessful.

6    Jones initiated this proceeding in June 2011. On November 23, 2011, this Court

7    entered an order directing Jones to show cause why his petition should not be denied

8    as untimely under 28 U.S.C. § 2244(d). The Court subsequently appointed counsel for

9    Jones and issued another order to show cause. On January 5, 2015, the Court made

10   an initial finding that Jones may be entitled to equitable tolling and directed him to file

11   an amended petition.

12   The amended petition was filed on June 16, 2015. In response to the petition,

13   respondents filed a motion to dismiss, which was denied. The parties have now fully

14   briefed the petition on the merits.

15   **II.    STANDARDS OF REVIEW**

16   This action is governed by the Antiterrorism and Effective Death Penalty Act

17   (AEDPA). 28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

18
19   > An application for a writ of habeas corpus on behalf of a person in
     > custody pursuant to the judgment of a State court shall not be granted with
20   > respect to any claim that was adjudicated on the merits in State court
     > proceedings unless the adjudication of the claim —

21   > (1) resulted in a decision that was contrary to, or involved an
     > unreasonable application of, clearly established Federal law, as
22   > determined by the Supreme Court of the United States; or

23   > (2) resulted in a decision that was based on an unreasonable
     > determination of the facts in light of the evidence presented in the State
24   > court proceeding.

25   28 U.S.C. § 2254(d).

26   A decision of a state court is "contrary to" clearly established federal law if the

27   state court arrives at a conclusion opposite that reached by the Supreme Court on a

28   question of law or if the state court decides a case differently than the Supreme Court

has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim *de novo* without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). *See also James v. Schriro*, 659 F.3d 855, 876 (9th Cir. 2011) (noting that federal court review is *de novo* where a state court does not reach the merits, but instead denies relief based on a procedural bar later held inadequate to foreclose federal habeas review).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2)."). Because *de novo* review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in *de novo* review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

## III.   DISCUSSION

### A.   Ground One

In Ground One, Jones alleges that he was deprived of his protection against self-incrimination under the Fifth and Fourteenth Amendments because the state trial court failed to instruct the jury that they could not draw an adverse inference from his failure

4

1 to testify. Jones presented the same claim to the Nevada Supreme Court on direct

2 appeal.

3     The Nevada Supreme Court held as follows:

4         Jones first contends that the district court prejudicially erred in not
5 giving a cautionary instruction that no inference could be drawn from his
failure to testify. State trial courts have a constitutional obligation to give a
6 cautionary instruction, upon proper request, "to minimize the danger that
the jury will give evidentiary weight to a defendant's failure to testify."
7 *Carter v. Kentucky*, 450 U.S. 288, 305, 101 S.Ct. 1112, 1121, 67 L.Ed.2d
241 (1981). Jones did not request a cautionary instruction, nor did he
8 request a related instruction authorized by NRS 175.181(1).

9         Jones argues that a *Carter* violation occurred at his trial despite his
failure to request the cautionary instruction. He contends that he was
10 prevented from requesting a cautionary instruction by NRS 175.181(1)
which the trial judge read to him while advising him of his right not to testify.
11 NRS 175.181(1) provides:

12         No instruction shall be given relative to the failure of
the person charged with the commission of crime or offense
13 to testify, except, upon the request of the person so charged,
the court shall instruct the jury that, in accordance with a right
14 guaranteed by the constitution, no person can be compelled,
in a criminal action, to be a witness against himself.

15         We have previously recognized the futility of objecting to an
16 instruction whose validity has been consistently upheld. *See St. Pierre v.
State*, 96 Nev. 887, 620 P.2d 1240 (1980). In *St. Pierre* we cited with
17 approval federal authority which excused the failure to request jury
instructions "which, at the time of . . . trial, would have been inconsistent
18 with the law as it then existed." *See United States v. Wanger*, 426 F.2d
1360 (9th Cir.1970); *St. Pierre*, 96 Nev. at 892, 620 P.2d 1240. We
19 therefore proceed to analyze this issue under St. Pierre's two prong
analysis focusing on (1) whether Jones had good cause for failing to
20 request the cautionary instruction and (2) whether Jones has suffered
prejudice to his substantial rights.

21         Jones has demonstrated good cause for his failure to request the
22 instruction. Until *Carter* compelled state courts to give a cautionary
instruction, if requested, we consistently held that an instruction
23 elaborating on the language of NRS 175.181 was properly rejected. *See
Theriault v. State*, 92 Nev. 185, 547 P.2d 668 (1976); *McNeeley v. State*,
24 81 Nev. 663, 409 P.2d 135 (1965). Jones' failure to request the instruction
was therefore "caused" by firmly established caselaw which suggested the
25 futility of such a request. As we stated in *St. Pierre*, "[t]here is no
requirement that a defendant or his trial counsel be clairvoyant." 96 Nev.
26 at 892, 620 P.2d 1240.

27         Although Jones had good cause for failing to request a *Carter*
instruction, we conclude that the absence of the instruction has not
28 prejudiced his substantial rights. A *Carter* error is evaluated under the
harmless error standard of *Chapman v. California*, 386 U.S. 18, 87 S.Ct.

5

824, 17 L.Ed.2d 705 (1967). *See Franklin v. State*, 98 Nev. 266, 270, 646 P.2d 543 (1982). In *Chapman* the High Court determined that a violation of a defendant's Fifth Amendment privilege would not mandate automatic reversal: "[T]here may be some constitutional errors which . . . are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." 386 U.S. at 22, 87 S.Ct. at 827.

After reviewing the evidence of Jones' guilt under this standard, we conclude that any prejudice to Jones resulting from the failure to give the cautionary instruction was harmless beyond a reasonable doubt. Evidence of Jones' guilt is overwhelming. Several eyewitnesses identified Jones as the killer. His counsel admitted in closing argument that Jones was the man who killed Brown. The only real dispute centered on the degree of Jones' intoxication. The jury was adequately instructed on this issue, and there was substantial evidence to support a finding that Jones was capable of premeditation. Given the overwhelming evidence of Jones' guilt, we conclude that the absence of a *Carter* instruction did not have any measurable impact on the jury's deliberations.

*Jones*, 707 P.2d at 1130–31.

Respondents do not dispute that the trial court's failure to issue a no-adverse-inference instruction violated Jones' constitutional rights under *Carter*. This Court sees no reason to conclude otherwise. The question then, is whether Jones can show that the error was harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015) ("In sum, a prisoner who seeks federal habeas corpus relief must satisfy *Brecht*, and if the state court adjudicated his claim on the merits, the *Brecht* test subsumes the limitations imposed by AEDPA."). In other words, habeas relief is proper only if the federal court has "grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'" *Ayala*, 135 S.Ct. at 2197-98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). "Mere speculation that the defendant was prejudiced by trial error" is not sufficient to meet the *Brecht* standard. *Id.*

Jones' defense at trial was that he was too intoxicated to form the specific intent necessary for first degree murder, which, under Nevada law, required premeditation and deliberation. With respect to whether the *Carter* error was harmless, Jones contends that, because specific intent was the pivotal factual question in his case, the jury would have placed significant weight on his failure to testify.

1    Even so, it would not have been enough weight to tip the scales in Jones' favor.

2    It is important to note that, to establish reasonable doubt on this point, evidence of mere

3    impairment is not sufficient. Jones had to present evidence showing that his level of

4    intoxication was so extreme that he was incapable of premeditation and deliberation.

5    *See Nevius v. State*, 699 P.2d 1053, 1060 (Nev. 1985) ("[T]o obtain an instruction on

6    voluntary intoxication as negating specific intent, the evidence must show not only the

7    defendant's consumption of intoxicants, but also the intoxicating effect of the substances

8    imbibed and the resultant effect on the mental state pertinent to the proceedings.").

9    The strongest evidence presented in support of the defense theory of intoxication

10    came from Jones' uncle, Archie Pope, who testified that he had been drinking with Jones

11    the night of the murder. According to Pope's testimony, he and Jones and a man named

12    Jackson drank some whiskey and several half-pint bottles of vodka between the time

13    Jones got off work that evening and about 12:30 a.m.[2] (ECF No. 65-2 at 60-62 and 110-

14    17.)[3] Pope also testified that Jones was "pretty well intoxicated" when Jones came home

15    between 6:00 and 7:00 a.m.[4] (*Id.* at 59-60.)

16    Jones also presented the testimony of Andrew Hamm, who lived in the vicinity

17    and saw a man matching Jones' general description walking in an undeveloped area

18    behind his house at about 6:00 a.m. that same morning. (*Id.* at 117-22.) Hamm testified

19    ///

20    

21    [2]Evidence presented at trial established that the murder occurred at approximately 4:30 a.m.

22    [3]Citations to page numbers for imaged documents on this Court's docket are based on CM/ECF pagination.

23    [4]Based on evidence presented at trial, at least three other relatives were living in

24    the house at the time. Jones' aunt testified that she thought Jones was drunk when he came home that morning, but did not elaborate on that opinion. (*Id.* at 53.) One of Jones'

25    cousins did not, during her testimony, comment on Jones' condition when he came home other than to note that he was muddy and dirty. (*Id.* at 65.) In addition, she testified

26    about seeing Jones, Pope, and Jackson earlier that night, between midnight and 1:00 a.m. (*Id.* at 69-71.) She stated that she saw Pope drinking, but did not see Jones drinking

27    and that she had never seen him drunk. (*Id.*) Another cousin living in the house testified that he did not have contact with Jones until later that morning, but his testimony made

28    no reference to whether or not Jones appeared intoxicated. (*Id.* at 74-79.) He also testified that he had never seen Jones drunk. (*Id.*)

1  that the man appeared to be drunk, although he could not positively identify the man as
2  Jones. (*Id.*)

3         In contrast and as noted by the Nevada Supreme Court, the testimony of two
4  witnesses present when Jones shot Brown supports a finding that Jones was not visibly
5  intoxicated at the time. (ECF No. 65-1 at 194-261.) While it is not disputed that Jones
6  chugged a half-pint of vodka just minutes prior to the shooting, a medical examiner
7  testified that there is a delay between the consumption of alcohol and the resulting
8  impairment. (*Id.* at 287-88.) And, as also noted by the state supreme court, Jones'
9  conduct immediately following the murder demonstrated that he was not so intoxicated
10 that he was unable to form the specific intent necessary to be found guilty of first degree
11 murder.

12        In summary, this Court does not have a grave doubt about whether the trial
13 court's failure to issue the no-adverse-inference instruction had a "substantial and
14 injurious" impact on the jury's verdict. Simply put, the balance of the evidence was not
15 close enough for the absence of such an instruction to have any effect on the outcome
16 of Jones' trial. Accordingly, the *Carter* error was harmless under the *Brecht* standard.
17 Ground One is denied.

18        **B.    Ground Two**

19        In Ground Two, Jones alleges that he was deprived of effective assistance of
20 counsel, in violation of his constitutional rights, when his counsel advised him to stipulate
21 to a life sentence without possibility of parole. As noted above, a jury sentenced Jones
22 to death in his second trial, but that verdict was set aside by the Nevada Supreme Court,
23 which remanded the case for a penalty hearing before a new jury. *Jones*, 707 P.2d at
24 1133-34. A few weeks prior to the scheduled date of the new penalty hearing, Jones'
25 counsel sent him a letter advising him to accept a plea offer of life without possibility of
26 parole. (ECF No. 40-38 at 37-38.) In that letter, counsel indicated that, even with that
27 sentence, Jones had a good chance of being released at some point. (*Id.*)
28 ///

In contending counsel's advice constituted ineffective assistance, Jones cites to available evidence that could have been used to potentially soften the seriousness his prior felony convictions involving violence (the only aggravating circumstance found by the jury in the previous trial), demonstrate he was a model prisoner, and show that he possesses significant mental impairments. (ECF No. 55 at 21-28; *see also Jones*, 707 P.2d at 1130, 1132 n. 2.) Jones also points to the Nevada Supreme Court's finding on direct appeal noting that his case did not fit the pattern of cases in which the death penalty had been imposed since the State's reenactment of capital punishment in 1977. *See Jones*, 707 P.2d at 1134.

A claim of ineffective assistance of counsel (IAC) is examined under *Strickland v. Washington*, 466 U.S. 668 (1984), which means that a petitioner must show that (1) "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and (2) counsel's errors "deprive[d] the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. Under the first *Strickland* prong, whether an attorney's performance was deficient is judged against an objective standard of reasonableness. *Id.* at 687-88. Under the second prong, a petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Because Ground Two was procedurally defaulted, this Court considers the claim *de novo*. *See Dickens v. Ryan*, 740 F.3d 1302, 1321 (9th Cir. 2014).

As an initial matter, Jones contends that his ineffectiveness claim should be analyzed under *Hill v. Lockhart*, 474 U.S. 52 (1985), which addressed the proper *Strickland* prejudice inquiry to be applied to claims challenging a guilty plea. 474 U.S. at 59. The Court in *Hill* announced that, to satisfy the "prejudice" requirement, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.*

While there are some similarities between foregoing a penalty hearing and waiving a trial to determine guilt, Jones offers no legal authority for his position that *Hill*

1   applies to his ineffectiveness claim. Moreover, a waiver of a right to trial on the issue of

2   guilt is far more significant than a waiver of a right to trial on sentencing. Thus, this Court

3   does not agree that, to show prejudice, Jones merely needs to show that, absent

4   counsel's alleged errors, he would have insisted on going forward with the penalty

5   hearing. Instead, Jones needs to show a reasonable probability that the outcome of the

6   sentencing proceeding would have been more favorable than the sentence he received.

7          Before addressing whether Jones can show prejudice, however, the Court first

8   considers whether counsel performed below constitutional standards in advising Jones

9   to stipulate to a sentence of life without possibility of parole. Objectively speaking, the

10  aforementioned letter counsel sent Jones overestimated Jones' chances of someday

11  being released on parole. Counsel appears to have been correct in advising Jones that,

12  because of the date of his offense, a commutation allowing for parole would not be

13  governed by a then-recent amendment to the Nevada Constitution and subsequent

14  changes to state law that restricted the availability of parole for prisoners sentenced to

15  death or life without parole. *See* 2004 Nev. Op. Att'y Gen. No. 04 (Mar. 25, 2004); *see*

16  *also Miller v. Ignacio*, 921 P.2d 882, 886 (Nev. 1996). Even so, counsel's use of the

17  phrase "most likely" to describe Jones' chances of "having a life outside at some point"

18  was overly optimistic.

19         That alone, however, does not establish that counsel's performance was deficient

20  under *Strickland. See Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986) (noting that "a

21  mere inaccurate prediction, standing alone," does not constitute ineffective assistance).

22  "[E]rroneous predictions regarding a sentence are deficient only if they constitute 'gross

23  mischaracterization of the likely outcome' of a plea bargain 'combined with . . . erroneous

24  advice on the probable effects of going to trial.'" *United States v. Keller*, 902 F.2d 1391,

25  1394 (9th Cir.1990) (quoting *Iaea*, 800 F.2d at 864-65).

26         Thus, even if counsel's prediction is considered a "gross mischaracterization of

27  the likely outcome," Jones would still need to show that counsel gave him erroneous

28  advice on the probable effects of proceeding to a penalty hearing. Because Jones had

1    been convicted of first degree murder, the only sentencing options available to the jury

2    were life with possibility of parole, life without possibility of parole, and death. Counsel

3    accurately advised Jones that, although the Nevada Supreme Court "made some

4    encouraging remarks as to whether the death penalty is appropriate" in his case, the

5    court reserved judgment as to whether it would uphold a subsequent death sentence.

6    (ECF No. 40-38 at 37.) S*ee Jones*, 707 P.2d at 1134-35 ("If the newly empaneled jury

7    opts to impose another death sentence on Jones, we will review the sentence at that

8    time for proportionality as required by [Nevada law].").

9          Jones contends counsel's advice was erroneous because the Nevada Supreme

10   Court had already determined that the death penalty was not "appropriate" in this case.

11   (ECF No. 69 at 27.) The relevant excerpt from the Nevada Supreme Court's opinion

12   stated as follows:

13              Our examination of all cases reported since 1977 reveals that the
             State of Nevada has not imposed a sentence of death in a first degree
14           murder case similar to the one at hand, but reserves capital sentencing for
             cases which exhibit a high degree of premeditation coupled with
15           aggravating circumstances such as brutality, torture or depravity. In
             contrast, Jones' victim died almost immediately from a single shot to the
16           head. Jones did not enter the bar intending to kill Brown; only after
             becoming antagonized did Jones leave to obtain the murder weapon.
17           Given the barroom-confrontation setting of this crime, it is possible that the
             jury's sentencing decision was influenced by improper factors. We
18           conclude that the prosecutor's misstatement of the powers of the pardons
             board may have convinced the jury that the only way to keep Jones off the
19           street was to kill him.

20   *Jones*, 707 P.2d at 1134.

21         Absent from that discussion are the aggravating circumstances the jury relied

22   upon in imposing the death sentence in the first place. The jury had been presented with

23   evidence of three prior felony convictions involving the use or threat of violence. (ECF

24   No. 65-3.) In 1968, Jones was convicted in Mississippi of assaulting a police officer but

25   did not begin serving his sentence until October 1970. (*Id.* at 43-45.) In the meantime,

26   Jones returned to Massachusetts, where he shot a man in the head in November of

27   1969 (*id.* at 47-49) and bit a police officer's ear lobe off (after trying to take the officer's

28   gun out of his holster) in August of 1970 (*id.* at 57-58).

In the context of discussing a separate issue, the Nevada Supreme Court noted that Jones' mother had testified to mitigating circumstances underlying the Mississippi conviction. *Jones*, 707 P.2d at 1132 n.2. According to that testimony, the assault occurred as Jones was fleeing a car that the police had set on fire. *Id.* Jones' mother also testified that Jones had a low IQ and was illiterate. (ECF No. 65-3 at 85-86.) Jones also presented testimony from officers for the Clark County Detention Center and Las Vegas Metropolitan Police Department that demonstrated that Jones was a diligent worker and a calming influence on other prisoners while incarcerated. (*Id.* at 66-80.)

As additional mitigating evidence to present at the second penalty hearing, Jones had obtained a letter from an officer at the Nevada State Prison which confirmed that Jones had adjusted well to prison and had been a hard worker requiring minimal supervision. (ECF No. 70-1.) Jones claims that the defense also intended to subpoena a witness to the ear-biting incident who, according to Jones, would have testified that Jones was not attempting to take the officer's gun and that he bit the officer's ear only because the officer had grabbed his arm in manner that made him feel like it was about to be broken. (ECF No. 69 at 23.) However, the record indicates that the witness preferred not to be involved in the case and contains no verification that the witness would have testified to these alleged facts. (ECF No. 56-4.)

Viewed as whole, the record does not demonstrate that Jones' counsel gave him erroneous advice as to the possibility that he could be sentenced to death at a second penalty hearing. While the Nevada Supreme Court suggested that the circumstances surrounding the murder was atypical for capital cases reported between 1977 and 1985, it did not take the death penalty off the table as a sentencing option. A jury had already once reached a death verdict after considering almost all of the mitigating evidence discussed above and the "additional" evidence that may have been presented at the second hearing is not particularly compelling.

Counsel was also accurate in telling Jones that life with possibility of parole "would seem the least likely sentence of the three" due to his criminal history, which was

presented to jury at the prior sentencing hearing and would again be presented to the new penalty phase jury. (*Id.*) Under Nevada law in 1987, parole eligibility under such a sentence began after the prisoner served ten years. Nev. Rev. Stat. § 200.030 (1987). Jones had already served nine years at the time. Given that the prior jury had issued a death verdict, the likelihood was very remote that the new sentencing jury, after considering similar evidence, would reach a verdict that would make Jones eligible for parole in the near future.

In summary, Jones has not demonstrated that counsel's performance fell below an objective standard of reasonableness, which means that he is not entitled to federal habeas relief on Ground Two. *See Strickland*, 466 U.S. at 700 ("Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim."). Moreover, Jones is also unable to satisfy the prejudice prong. To do so, he would need to establish, at a minimum, that there was a reasonable probability that, had he proceeded to a penalty hearing, the jury would have imposed a sentence of life with possibility of parole. For the reasons noted above, such a sentence was highly unlikely.

Finally, the transcript of the hearing at which Jones stipulated to a sentence of life without possibility of parole confirms that he did so without any promise from anyone, including counsel, that his sentence would ever be reduced and with the understanding that he could spend the rest of his life in prison. (ECF No. 38-6.)

Based on the foregoing, this Court concludes that Jones was not deprived of effective assistance of counsel, in violation of his constitutional rights, when his counsel advised him to stipulate to a life sentence without possibility of parole. Ground Two is denied.

## IV.   CONCLUSION

For the reasons set forth above, Jones' amended petition for habeas relief is denied.

///

*Certificate of Appealability*

This is a final order adverse to the petitioner. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Accordingly, the Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002).

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

Having reviewed its determinations and rulings in adjudicating Jones' petition, the Court finds that reasonable jurists could debate the Court's resolution of Ground Two, above. Specifically, it is at least arguable that Jones' counsel provided him with ineffective assistance of counsel in advising him to stipulate to a sentence of life without possibility of parole. The Court declines to issue a certificate of appealability for its resolution of any other procedural or substantive issue.

It is therefore ordered that petitioner's amended petition for writ of habeas corpus (ECF No. 55) is denied. The Clerk will enter judgment accordingly.

It is further ordered that a certificate of appealability is granted as to the following issue:

Whether this Court erred in its resolution of Ground Two by concluding that Jones was not deprived of effective assistance of counsel, in violation of his constitutional rights, when his counsel advised him to stipulate to a sentence of life without possibility of parole.

14

It is further ordered that all pending motions for extension of time (ECF Nos. 61, 62, 63, 66, 67 and 68) are all granted *nunc pro tunc* as of their respective filing dates.

DATED THIS 14th day of March 2017.

_____

MIRANDA M. DU
UNITED STATES DISTRICT JUDGE